**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| SMARTENERGY HOLDINGS, LLC<br>d/b/a SMARTENERGY,<br><br>   *Plaintiff*,<br><br>v.<br><br>FREDERICK H. HOOVER, in his official<br>capacity as Chair of the Maryland Public<br>Service Commission, et al.,<br><br>   *Defendants* | Case No. 24-cv-2336-ABA |

**MEMORANDUM OPINION**

Beginning in 2017, Plaintiff SmartEnergy Holdings operated in Maryland as a renewable electricity supplier. In March 2021, the Maryland Public Service Commission (the "PSC") concluded that SmartEnergy's marketing and sales practices in Maryland violated the Electric Customer Choice and Competition Act of 1999, the Maryland Telephone Solicitations Act, and regulations promulgated by the PSC. SmartEnergy challenged that order in the Maryland courts, and in February 2024, the Supreme Court of Maryland affirmed findings that SmartEnergy had violated those consumer protection laws, and affirmed the remedies that had been imposed, including requiring that SmartEnergy issue partial refunds to customers. *In the Matter of Smart Energy Holdings, LLC*, 486 Md. 502 (2024).

Having exhausted its state-court challenges, SmartEnergy filed this federal lawsuit against the members of the PSC, contending that (1) the monetary remedies imposed by the PSC and upheld by the Supreme Court of Maryland violate the Excessive Fines Clause of the Eighth Amendment of the U.S. Constitution, and (2) the PSC's

procedures violate the civil jury right set forth in Article 23 of the Maryland Constitution. Defendants have moved to dismiss the complaint. For the reasons set forth below, the motion will be granted and the complaint will be dismissed with prejudice.

## I.    BACKGROUND

The Supreme Court of Maryland laid out in detail the facts found by the PSC during the enforcement proceedings, and the procedural history of SmartEnergy's challenges to those proceedings. *Smart Energy*, 486 Md. at 517–47. The parties are familiar with those proceedings and opinion, and the Court does not repeat that background in full. The following is a summary of those facts and background.

### A.    The regulatory framework for electricity supply in Maryland

The PSC was established in 1910 "for the purpose of regulating public utilities and transportation companies conducting business in Maryland." *Id.* at 520–21 (citing 1910 Md. Laws, ch. 180). The PSC "has jurisdiction over each public service company that engages in or operates a utility business in the State 'to the full extent that the Constitution and laws of the United States allow.'" *Id.* at 521 (quoting Md. Code Ann., Public Utilities Article §§ 2-101, 2-112(a) (2020 Repl. Vol., 2023 Supp)).

In 1999, the Maryland General Assembly enacted the Electric Customer Choice and Competition Act of 1999 (the "Choice Act"), which "deregulated the electric industry in Maryland." *Id.* at 515. "Prior to the enactment of the Choice Act, electric energy supply and electric energy distribution were bundled together and were exclusively provided by one electric utility company to customers within the distribution territory for that company." *Id.* The Choice Act "establish[ed] 'customer choice of electricity supply' and create[ed] 'competitive retail electricity supply and electricity supply services markets.'" *Id.* (quoting Md. Code Ann., Public Utilities Article § 7-504(1), (2)).

By "unbundl[ing]" the "component parts of the electric service," the Choice Act kept "distribution" of electricity subject to a monopoly, but permitted Maryland consumers to "shop on the open market for a third-party retail energy supplier." *Id*. at 515–16. Thus, the legislature "intended that electricity supply rates would be largely established by the open market." *Id*.

"As a condition to selling electricity in Maryland, the Choice Act requires that an electricity supplier hold a license that is issued by the [PSC]." *Id*. at 516. And the PSC has "regulatory authority and oversight" to "ensure that electricity suppliers who sell electricity in Maryland comply with applicable laws designed to protect consumers, including the State's consumer protection laws." *Id*. One of those consumer protection statutes over which the PSC has enforcement authority for electricity suppliers is the Maryland Consumer Protection Act. Md. Code Ann., Com. Law ("CL") § 13-101 *et seq*. (the "MCPA"); *see also Smart Energy*, 486 Md. at 518 (explaining that the PSC has "concurrent enforcement authority" along with other agencies, including the Division of Consumer Protection in the Office of the Attorney General, for enforcement of the MCPA). Another is the Maryland Telephone Solicitations Act, CL § 14-2201 *et seq*. (the "MTSA").

The MCPA contains a prohibition on unfair, abusive, or deceptive trade practices, *id*. § 13-303, and identifies "a nonexclusive list of such practices, which includes making any '[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers.'" *Smart Energy*, 486 Md. at 518 (quoting CL § 13-301(1)). The statute expressly provides that a violation of the MTSA constitutes an "unfair, abusive, or deceptive trade practices" under the MCPA. CL § 13-301(14)(xiv).

3

The MTSA, in turn, "requir[es] that a contract made pursuant to a telephone solicitation meet certain conditions." *Smart Energy*, 486 Md. at 519 (quoting 1988 Md. Laws, ch. 588).

Under the MTSA, a "[t]elephone solicitation" is an "attempt by a merchant to sell or lease consumer goods, services, or realty to a consumer located in this State that is: (1) [m]ade entirely by telephone; and (2) [i]nitiated by the merchant." CL § 14-2201(f). The MTSA requires that when a merchant makes a "[t]elephone solicitation," and seeks to bind a consumer to a contract in connection with that telephone solicitation, the contract must "be reduced to writing and signed by the consumer." *Id*. § 14-2203(b)(1). Specifically, "[a] merchant engaging in a telephone solicitation may not make or submit any charge to the consumer's credit account until after the merchant receives from the consumer a copy of the contract which complies with" the MTSA. *Id*. § 14-2204.[1]

In addition, the PSC has promulgated regulations that, among other things, prohibit a supplier from engaging "in a marketing or trade practice that is unfair, false, misleading, or deceptive." COMAR 20.53.07.07(A)(2). The regulations state that "[a] supplier soliciting customers by telephone shall comply with all applicable State and federal law, including the [MTSA]." *Id*. 20.53.07.07(D)(1). And they require energy

---

[1] As discussed below, one of the most heavily disputed questions in the proceedings underlying this case was whether, when SmartEnergy sent postcards to customers urging them to call SmartEnergy to switch their electricity supplier to SmartEnergy, and those customers called and then agreed to switch, those communications were "(1) [m]ade entirely by telephone; and (2) [i]nitiated by the merchant" within the meaning of the MTSA, Md. Code Ann., Com. Law § 14-2201(f). The administrative law judge who originally heard the case concluded they did not qualify as "telephone solicitations." *See SmartEnergy*, 586 Md. at 532. But the PSC concluded they did qualify, ECF No. 4-3 at 31–35, a conclusion affirmed by all three levels of Maryland courts that reviewed SmartEnergy's challenge to the PSC proceedings. *See* § I.B, *infra*.

suppliers to include in their written contracts with consumers "all material terms and conditions," including specific terms set forth in COMAR 20.53.07.07(A)(2), and to provide a "Contract Summary" in a form provided by the PSC, *id.* 20.53.07.08(B).

**B.    SmartEnergy's marketing efforts, and PSC's enforcement action**

SmartEnergy is an electricity supplier that "sells 100% renewable energy." *Smart Energy*, 486 Md. at 524. In February 2017, the PSC issued a Maryland electricity supplier license to SmartEnergy, which is based in New York. *Id.* "Thereafter, SmartEnergy commenced marketing efforts to solicit customers and enrolled Maryland consumers in electricity contracts that were consummated during telephone calls between the consumer and SmartEnergy's agents." *Id.* Those "marketing efforts, and the contracts that SmartEnergy entered into with Maryland consumers during telephone calls," became the subject of the PSC's enforcement action. *Id.*

SmartEnergy used several means to advertise its services. One was through postcards, mailing 6 million of them between February 2017 and May 2019. *Id.* The postcards contained various representations, including that consumers were "eligible" for a "free month of electricity" and urging customers to "[c]all us today to claim this benefit," and "made multiple references to the consumer's existing utility company." *Id.* at 524–25. For consumers whose default electricity suppliers was Baltimore Gas and Electric (BGE), the postcards contained the words "SmartEnergy for BGE customers," but also stated (in smaller print) that SmartEnergy was "not affiliated with BGE." *Id.* at 525. That specific language became relevant to the enforcement proceeding because "BGE had a 'Smart Energy Rewards' program"; the administrative law judge concluded that, given the existence of that BGE program, SmartEnergy's reference to

"SmartEnergy for BGE customers" "had the tendency to mislead customers into thinking they were being offered a utility program or service." *Id.* at 533.

When customers called the phone number on the postcards, SmartEnergy agents were directed to follow a script. *Id.* at 526. As explained below, the PSC concluded that some aspects of the postcards, and some statements in that script, were misleading.

"Of the approximately 104,000 calls from prospective customers during the relevant period, approximately 32,000 callers enrolled as customers with SmartEnergy." *Id.* at 527. For customers who enrolled, SmartEnergy sent them a "Welcome Kit" that set forth several of the key terms for SmartEnergy's supply of their electricity, but "did not provide written contracts or contract summaries to those customers who enrolled." *Id.*

A small number of customers—34 out of the tens of thousands of SmartEnergy customers in Maryland—filed complaints about SmartEnergy with the PSC's Consumer Affairs Division ("CAD"). *Id.* at 528. "The bases of these complaints included that: the customer's electricity supply was switched without their authorization; SmartEnergy portrayed itself as being affiliated with the customer's then-current electricity provider; the bills were excessive; and the customers were unable to cancel their service." *Id.* Based on those complaints, PSC staff filed a complaint on May 10, 2019, and requested that the PSC issue a show cause order. *Id.* at 529. The PSC issued the requested order and "delegated the case to the Public Utility Law Judge ('PULJ') Division for investigation." *Id.* The PSC staff later filed amended complaints, and the Office of People's Counsel (a position appointed by the Attorney General and confirmed by the Maryland Senate, *see* Md. Code Ann., Public Utilities Article § 2-202 & 2-204) also filed a complaint. *Id.*

The PULJ assigned to the case received evidence, including written witness testimony, and in September 2020 entered partial summary judgment against SmartEnergy "for failing to provide its customers with a contract summary at the time of the completion of the contract process for the period between February 2017 until the Commission Staff filed its complaint in May 2019, in violation of the Commission's regulations." *Smart Energy*, 486 Md. at 530. "After an evidentiary hearing in October 2020, the PULJ issued a 28-page proposed order with detailed findings of fact and recommendations concerning a remedy and penalty." *Id.* at 532. The Supreme Court of Maryland summarized the PULJ's findings this way:

> First, the PULJ found that the MTSA did not apply to SmartEnergy's business practices because "the solicitations began with something other than a phone call to the consumer from SmartEnergy[.]" After concluding that the MTSA did not apply, the PULJ nonetheless found that SmartEnergy "engaged in deceptive trade practices as part of its operations in Maryland" and "engaged in a pattern or practice of systemic violations of the consumer protections" that are prohibited by the Choice Act and the Commission's regulations promulgated in accordance with its regulatory authority under the Choice Act. The PULJ made her findings based upon the testimony and exhibits, which included SmartEnergy's mailing materials, SmartEnergy's telephone script that was used in connection with the telephone transactions, customer complaints in connection with the CAD complaints, and audio recordings of the telephone transactions that were the subject of the CAD complaints.

*Id.*

In particular, the PULJ made findings of fact that during the calls when customers called the number on the postcards, SmartEnergy engaged in conduct that had the "capacity, tendency, or effect of deceiving or misleading customers." *See* CL §§

13-301(1)(3), 13-303. As the Supreme Court summarized, the PULJ "found the following portions of the script to be misleading":

- The statement "as a [utility name] customer . . . you are eligible to receive one free month of electricity" when coupled with the promotional "price protection" offer pursuant to which agents told customers their rate would not change, caused customers to believe they were dealing with their utility company, not an electricity supplier.

- The statement that the call may be recorded for quality and training purposes when the calls were, in fact, recorded for the purpose of verifying the contract pursuant to the applicable regulations requiring that contracts arising from telephone solicitations be recorded.

- Telling customers that they were eligible to receive one month of free electricity on their utility bill by "using" smart energy. With respect to BGE customers in particular, because BGE had a "Smart Energy Rewards®" program, the PULJ found that the script had the tendency to mislead customers into thinking they were being offered a utility program or service.

- Statements related to the 6-month price protection plan that had the capacity to mislead or deceive customers into thinking that the price they were currently paying for electricity would not increase.

- Statements implying that the customer's current rate with their current utility would go up during high usage periods like winter and summer, which the PULJ determined were false and deceptive with respect to actual trends in the standard offer service.

- Failing to disclose, during the sales pitch portion of the call, the rate that the customer would pay once they switched to SmartEnergy, thereby misleading customers into thinking that the price would not increase from the current rate they were paying for electricity.

- The statement that the agent wanted to make sure that the price protection was being applied to the current account reinforced the deception that the price would not increase from the rate that customers were currently paying for electricity.

- Under the confirmation questions portion of the script—once the agent believed that the customer had agreed to the promotion being offered—the agent's statement that, "[n]ow I just need to ask you two quick questions to confirm the information we discussed." The PULJ determined that the statement was misleading because, in fact, the information that had been included up to that point in the sales pitch had not been previously discussed.

- In an attempt to obtain affirmative confirmation by the customer to all terms and conditions of the contract, the agent read a statement containing several pieces of information, and then customers were asked if they understood their right to cancel. The statement was misleading as to whether the customer was assenting to all the terms mentioned, or only whether the customer understood that they had the right to cancel.

*SmartEnergy*, 486 Md. at 533–34.

"The PULJ found that the confusing, deceptive, and misleading nature of the script was confirmed by the testimony and a review of the audio recordings associated with the CAD complaints, as well as additional audio recordings that were admitted into evidence that were not associated with the CAD complaints." *Id.* at 534. Based on selected recordings of calls, the PULJ found that SmartEnergy agents "failed to always disclose" that the "free month" of electricity would be calculated based on the customer's "seventh month of SmartEnergy's retail supply" and "was only available if the customer sent in the redemption or rebate form." *Id.* at 535. The PULJ also found that agents "thwarted customers' attempts to cancel their enrollments, which the PULJ found to be

particularly egregious because during the contracting process, when customers expressed doubt about enrolling, agents stressed the ability to cancel at any time." *Id.* The PULJ found that the mailing materials also violated Choice Act regulations because, during an 18-month period, they did not contain SmartEnergy's license number. *Id.* at 532.

"Based upon the testimony and evidence presented, the PULJ concluded that SmartEnergy engaged in a pattern or practice of systematic violations of the consumer protection provisions contained in the Choice Act and the Commission's regulations." *Id.* at 536. The PULJ characterized the violations as "egregious." *Id.* at 537. As for a remedy, the PULJ recommended that the PSC (1) "impose a moratorium prohibiting SmartEnergy from adding or soliciting new customers," (2) order SmartEnergy to "cancel existing customer enrollments and return those customers to the utilities' standard offer service unless the customer took affirmative action to remain with SmartEnergy," and (3) "require that the rates charged by SmartEnergy be re-rated to the utility standard offer service rate, and that current and former SmartEnergy customers be refunded the difference for each month of service." *Id.* at 536–37. The PULJ also recommended that the PSC impose a civil penalty, but did not recommend an amount, instead recommending that the PSC "at a later date . . . address whether $300,000 [the amount requested by PSC staff] or some other amount is the appropriate civil monetary penalty to be imposed." *Id.* at 538.

SmartEnergy, the PSC staff, and the OPC "each appealed aspects of the PULJ's findings of fact and proposed order." *Id.* On March 31, 2021, the PSC entered a 66-page decision and order that affirmed the PULJ's findings of fact and proposed order in part, reversed it in part, and clarified it in part. ECF No. 4-3 (PSC Order on Appeals and

Exceptions). As an initial matter, the PSC concluded that, contrary to the PULJ's conclusion, the MTSA applied to SmartEnergy's business practices, and that when SmartEnergy's postcards prompted customers to call SmartEnergy, SmartEnergy "initiated" the call, and thus those calls qualified as "[t]elephone solicitation[s]" that were "[i]nitiated by the merchant." *Id.* at 35–36[2]; *see* CL § 14-2201(f) (defining "Telephone solicitation"). The PSC further concluded that PSC failed to comply with the MTSA's requirement that contracts "made pursuant to a telephone solicitation" be "reduced to writing and signed by the consumer." *See id.* § 14-2203(b)(1); ECF No. 4-3 at 41.

The PSC "rejected SmartEnergy's argument that the PULJ erred in finding that SmartEnergy's written telephone script had the capacity, tendency, or effect of deceiving or misleading customers." *SmartEnergy*, 486 Md. at 539; ECF No. 4-3 at 43–54. The PSC "affirmed the PULJ's findings that: SmartEnergy's sales agents regularly thwarted customers' attempts to cancel SmartEnergy's service; SmartEnergy failed to monitor agents' sales calls as required by the Commission's regulations; and SmartEnergy did not have an independent third party verify customer confirmation for purposes of its enrollments and contracts." *SmartEnergy*, 486 Md. at 539–40; *see* ECF No. 4-3 at 56–57. The PSC "further found that SmartEnergy's supplier license number that was added to the postcards in July 2018 was not provided in a 'conspicuous manner' as defined by CL § 1-201(b)(10) and, therefore, SmartEnergy violated the requirements of COMAR 20.53.07.07B(1)." *SmartEnergy*, 486 Md. at 540; *see* ECF No. 4-3 at 54. With respect to

---

[2] Page numbers herein refer to the ECF pagination in the header of the parties' filings. Those page numbers do not necessarily align with the documents' original page numbers.

the PULJ's findings regarding statements during the phone calls, the PSC rejected
SmartEnergy's argument that the PULJ's findings were infected by "selection bias."
*SmartEnergy*, 486 Md. at 540–41; *see* ECF No. 4-3 at 58–59.

The PSC then turned to the question of appropriate remedies. SmartEnergy
objected to the requirement that it re-rate customer bills and provide refunds based on
the utility standard offer service rates; it argued that comparing SmartEnergy's rates to
standard utility rates "would result in an 'apples to oranges' comparison" and that
ordering such refunds and re-rating was arbitrary and capricious and "inconsistent with
Commission precedent." *See SmartEnergy*, 486 Md. at 541. SmartEnergy, for its part,
proposed to pay a penalty of $300,000 and adopt other prospective remedial measures.
*Id.* PSC staff recommended a penalty of "at least $500,000" and revocation of
SmartEnergy's license. *Id.* at 542. The Office of People's Counsel advocated for a penalty
of "at least $3,164,000." *Id.* The PSC "concluded that the record in this case warranted
cancellation of all SmartEnergy customer enrollments in Maryland that occurred over
the telephone, the return of all such customers to utility standard offer service, and the
issuance of refunds to affected customers for the difference between SmartEnergy's rate
and the customers' utilities' standard offer service." *Id.* at 543; *see* ECF No. 4-3 at 66–
68. The PSC also entered a final order "continuing the moratorium prohibiting
SmartEnergy from soliciting or enrolling new customers in Maryland." *SmartEnergy*,
486 Md. at 544; *see* ECF No. 4-3 at 69. The PSC "reserved its final decision regarding
the possibility of license suspension and/or revocation, and the assessment of a civil
monetary penalty, until after SmartEnergy complied with the directives in the
Commission's order, including making refunds to all customers who had invalid
contracts." *SmartEnergy*, 486 Md. at 544; *see* ECF No. 4-3 at 68.

### C.    Judicial review in the Maryland courts

SmartEnergy filed a petition for judicial review in the Circuit Court for Montgomery County, which affirmed the PSC's decision. SmartEnergy appealed to the Appellate Court of Maryland. It raised four arguments on appeal: (1) that the PSC lacked jurisdiction to impose penalties arising from alleged violations of the MTSA, (2) the phone calls were not "telephone solicitations" under the MTSA, (3) the PSC acted "arbitrarily and capriciously in affirming findings of the PULJ regarding SmartEnergy's postcards, sales script, cancellation procedures, training, and monitoring," and (4) the PSC acted arbitrarily and capriciously or violated due process when it required SmartEnergy to, "among other things, pay millions of dollars in 're-rates' to its current and former Maryland customers." *See In re SmartEnergy Holdings, LLC*, 256 Md. App. 20, 29 n.1 (2022). The Appellate Court affirmed the circuit court's judgment. *Id.*

SmartEnergy sought further review, and the Supreme Court of Maryland granted SmartEnergy's petition for certiorari. In the Supreme Court, SmartEnergy argued that (1) the PSC did not have jurisdiction to interpret and enforce the MTSA, (2) the MTSA did not apply to the phone calls, and (3) the PSC's "findings and penalties . . . were not supported by substantial evidence and were . . . arbitrary and capricious." *SmartEnergy*, 486 Md. at 546 n.27. The Supreme Court affirmed. It held that the PSC "has the authority to ensure that electricity suppliers, such as SmartEnergy, 'comply with specific consumer protection laws, under which the MTSA falls.'" *Id.* at 551 (quoting the Appellate Court). It held that the MTSA's definition of "telephone solicitation" "applies to both telephone calls initiated by the merchant, as well as telephone calls initiated by the consumer in response to marketing materials sent by the merchant, unless the transaction falls within one of the statutory exemptions outlined in CL § 14-2202." *Id.* at

561. The Supreme Court affirmed the PSC's findings of fact, including regarding the postcards, the sales calls, attempts to "thwart customers' efforts to cancel their service," and SmartEnergy's "fail[ure] to adequately monitor telephonic sales calls." *Id.* at 564–71. It held the PSC "did not err in affirming the PULJ's dismissal of SmartEnergy's selection bias argument." *Id.* at 573. And it affirmed the remedies imposed by the PSC, including that the PSC "had just cause to order that partial refunds be issued and customers be returned to their prior utility's standard offer service." *Id.* at 573–77.

Justice Gould concurred in part and dissented in part. He disagreed with the majority's holding that the MTSA applied to calls initiated by SmartEnergy's postcards, and opined that because the PSC's Consumer Affairs Division had previously taken the position that the MTSA did not apply to "inbound calls," the PSC's decision to take the opposite position in the enforcement action was arbitrary and capricious. *Id.* at 578–90 (opinion of Gould, J.). Justice Gould also opined that because the call recordings in the record were only a "miniscule sample size" of the over 100,000 calls that SmartEnergy received from potential customers in Maryland, the PULJ's finding of a "pattern or practice of systematic violations" was not supported by substantial evidence, and thus the matter should have been remanded to the PSC to reconsider its liability findings "without relying on extrapolations from the 34 phone calls" that were in the record. *Id.* at 591–92 (opinion of Gould, J.).

### D.    Subsequent proceedings, and SmartEnergy's wind-down in Maryland

On March 4, 2024, following the opinion issued by the Supreme Court of Maryland, the PSC issued a letter Order directing SmartEnergy to make a supplemental filing concerning bond and refund amounts. ECF No. 1 ¶ 70. On March 22, 2024,

SmartEnergy filed its response identifying, as requested by the PSC, every bill it had sent to a Maryland customer, the customer's usage for that billing cycle, and the difference between the rate charged by SmartEnergy and the one charged by a utility. *Id.* ¶ 71. "In total, SmartEnergy calculated that it would owe a total amount of approximately $15.7 million." *Id.*

SmartEnergy also informed the PSC that it "would face significant hardship in complying with the expected total refund amount." *Id.* ¶ 72. On April 8, 2024, SmartEnergy submitted a letter notifying the Commission that it was surrendering its license to supply electricity in the state of Maryland. *Id.* ¶ 73. SmartEnergy ascribed the reason for that decision to new legislation, *id.*, specifically S.B. 1, 446th Gen. Assemb. (Md. 2024). On April 23, 2024, the PSC denied SmartEnergy's surrender of its license, and "further directed SmartEnergy to submit the amount it will need to pay to ensure compliance" with the PSC's March 31, 2021 order. *Id.* ¶ 74. SmartEnergy "reiterat[ed] that it calculated a total potential refund obligation of $15.97 million," but contended that it lacks the "ability to pay" the refunds, though it would "satisfy its refund obligations as much as its balance sheet will allow." *Id.* ¶ 76. "SmartEnergy has contended that it can at most pay $3 million." *Id.* ¶ 77.

But the question remained whether, in addition to refunds, the PSC would demand payment of a penalty. On August 5, 2024, PSC staff filed a proposal that the PSC impose a civil monetary penalty of $15.97 million, *i.e.* an amount equal to the refunds. *Id.* ¶ 55.

That was the posture when this case was filed, on August 12, 2024. Since then, proceedings before the PSC have continued, including briefing on a post-appeal motion on refunds filed by SmartEnergy, and a determination of whether a civil monetary

penalty would be imposed. On April 28, 2025, the PSC issued an Order on Motions to Enforce and/or Modify. ("April 2025 Order"). In that order, the PSC, among other things, suspended "all but $6.5 million of SmartEnergy's refund liability, subject to SmartEnergy's timely and full remittance of partial refunds to satisfy its refund liability within 90 days." The PSC also decided on a civil monetary penalty: $250,000, an amount "consistent with the civil penalty imposed by the Commission in other supplier enforcement proceedings."[3] And on June 9, 2025, following a request for clarification by SmartEnergy, the PSC issued Order No. 91676, revising aspects of the timeline and refund process, including extending the deadline for SmartEnergy to comply with the April 2025 Order. ECF No. 16-4.

### E.    This case

In August 2024, SmartEnergy filed this case, seeking declaratory and injunctive relief. It named as defendants the current members of the PSC, asserting two causes of action. In Count 1, it alleges that the PSC has violated the Excessive Fines Clause of the Eighth Amendment, as well as Article 25 of the Maryland Declaration of Rights, both of which prohibit "excessive fines." ECF No. 1 ¶¶ 85–93. In Count 2, it alleges that the PSC violated SmartEnergy's right to a civil jury trial under Article 23 of the Maryland Constitution, which provides that the "right of trial by Jury of all issues of fact in civil

---

[3] The PSC's April 2025 Order is not in the record of this case, but this Court may take judicial notice of it because it is an "adjudicative fact . . . not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b). *See also Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986) ("Although this case comes to us on a motion to dismiss . . . , we are not precluded in our review of the complaint from taking notice of items in the public record . . . ."); *Morris v. David Lerner Assocs.*, 680 F. Supp. 2d 430, 436 (E.D.N.Y. 2010) (administrative filings are matters of public record).

proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of $25,000, shall be inviolably preserved." *Id.* ¶¶ 95–109 (quoting Md. Const. Decl. of Rts. art. 23).[4]

At no time during the proceedings before the PULJ, the PSC, the Circuit Court for Montgomery County, the Appellate Court of Maryland, or the Supreme Court of Maryland, did SmartEnergy contend that it was entitled to a jury trial with respect to the enforcement action, or contend that any of the penalties violated the Eighth Amendment. *See* ECF No. 4-1 at 13–14; ECF No. 10 at 17. Only after the Supreme Court's decision (and the filing of this case) did SmartEnergy file a motion with the PSC, on September 3, 3024, seeking a jury trial. In April 2025, when the PSC reduced the refund obligation and selected a monetary penalty, the PSC rejected SmartEnergy's argument that it was entitled to a jury trial. April 2025 Order at 21–25.

## II.    DISCUSSION

Defendants have filed a motion to dismiss, contending SmartEnergy's complaint does not state claims on which relief can be granted, under either the Eighth Amendment of the U.S. Constitution (Count 1), or Article 23 of the Maryland Declaration of Rights (Count 2). For the reasons explained below, the Court agrees, and grants the motion.[5]

---

[4] SmartEnergy alludes to the Seventh Amendment of the U.S. Constitution in its complaint, *id.* ¶ 98, and federal cases applying it, *id.* ¶¶ 99–104, but in its brief in opposition to Defendants' motion to dismiss, SmartEnergy clarifies that it "does not contend that the Seventh Amendment applies to the States" or that it otherwise has asserted a claim under the Seventh Amendment.

[5] More recently, in response to SmartEnergy's motion for a preliminary injunction, Defendants argued that the complaint should be dismissed pursuant to the *Rooker-*

A.    **Standard of Review**

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). At the pleadings stage, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*,

---

*Feldman* doctrine. ECF No. 18-1 at 12–15. Because the Court concludes the complaint does not state claims on which relief can be granted, the Court does not reach the question of whether the *Rooker-Feldman* doctrine also counsels in favor of dismissal. The Supreme Court has sometimes referred to that doctrine as a "jurisdictional bar," *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 287 n.2 (2005), a framing reiterated recently by the Fourth Circuit, *T.M. v. Univ. of Maryland Med. Sys. Corp.*, 139 F.4th 344, 346 (4th Cir. 2025). That would suggest this Court must reach that issue. *See Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022) ("Generally, a court must resolve jurisdictional issues before considering the merits of a claim.") (citing *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94–95 (1998)). At other times, the Supreme Court has described the doctrine as an "abstention doctrine." *Johnson v. De Grandy*, 512 U.S. 997, 1005 (1994). This Court need not (and does not) decide whether *Rooker-Feldman* is a jurisdictional doctrine subject to *Steel Co.*, however—or whether the doctrine requires dismissal or abstention—because of the procedural posture in which the issue has been raised. Defendants did not raise *Rooker-Feldman* in their motion to dismiss or reply brief. Although Defendants are correct that questions of subject-matter jurisdiction can be raised at any time, *see* ECF No. 18 at 1, because this Court is granting the motion to dismiss, the motion for a preliminary injunction will be denied as moot, and the Court does not reach the issues raised therein or in Defendants' opposition thereto. In other words, the Court does not decide whether *Rooker-Feldman* provides an additional or alternative ground for dismissal of SmartEnergy's complaint.

550 U.S. 544, 555 (2007). The pleadings must contain sufficient factual allegations to state a facially plausible claim for relief. *Id*. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.     Count 1 – Eighth Amendment Claim

As noted above, one of the remedies PSC imposed, and that the Maryland courts upheld, was the following order (the "Refund Order"):

> SmartEnergy is directed—within thirty (30) days—to re-rate and refund all of its Maryland customers solicited via telephone the difference between the Supplier's supply charges and the applicable SOS rate from the local utility for all periods these customers were served, whether the customers are an existing customer or a former customer, and provide an accounting to the Commission within sixty (60) days of the refund amount sent to each of these customers.

ECF No. 4-3 at 70 (¶ 4). Since then, in its April 2025 Order, the PSC suspended "all but $6.5 million of SmartEnergy's refund liability, subject to SmartEnergy's timely and full remittance of partial refunds to satisfy its refund liability within 90 days," and selected a civil monetary penalty of $250,000.

Defendants argue that Count 1 should be dismissed for three reasons: (1) that, at least as of when SmartEnergy filed its complaint, the amounts that the PSC would assess for the refund and the civil penalty were undetermined, and thus not ripe for adjudication; (2) that the PSC's Refund Order was a purely remedial penalty and not a "fine" within the purview of the Eighth Amendment's prohibition on excessive fines; and (3) even if the refund order was a "fine" for Eighth Amendment purposes, it was not

constitutionally "excessive." ECF No. 4-1 at 4. This court will address each argument in turn.

### i.     Ripeness

"A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)) (internal quotations omitted). When SmartEnergy filed its complaint, the PSC had not decided on the amount of a restitution order or fine. The issues at that time may very well have been unripe—though that is not an issue this Court needs to decide. *See Chang v. United States*, 327 F.3d 911, 921 (9th Cir. 2003) ("[We] do[] not require Damocles's sword to fall before we recognize the realistic danger of sustaining a direct injury"). The April 2025 Order, of which this Court takes judicial notice, *see* n.2, *supra*, makes clear that "the amount of any potential award" is no longer "purely speculative" as Defendants had previously asserted, ECF No. 4-1 at 19, and thus SmartEnergy's claim is ripe (though it fails on the merits, for the reasons discussed below).

### ii.     Whether the Eighth Amendment Applies

The Eighth Amendment prohibits the imposition of "excessive fines." U.S. Const. amend. VIII. The Eighth Amendment is incorporated as against the states. *Timbs v. Indiana*, 586 U.S. 146, 154 (2019).[6] A "fine" within the context of the Eighth

---

[6] SmartEnergy refers to Article 25 of the Maryland Declaration of Rights of the Maryland Constitution within the complaint, ECF No. 1 ¶ 87, which it argues is interpreted "co-extensively" with the Eighth Amendment, *see* ECF No. 10 at 20 n. 6, but SmartEnergy's cause of action in Count 1 is asserted under the Eighth Amendment of the U.S. Constitution. *See, e.g.*, ECF No. 1 ¶¶ 85, 88–89, 93.

Amendment most commonly refers to punishment for a criminal offense. *See Browning-Ferris Indust. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989) ("[A]t the time the of the drafting and ratification of the [Eighth] Amendment, the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense."). That is because "[t]he purpose of the Eighth Amendment, putting the Bail Clause to one side, was to limit the government's power to punish." *Austin v. United States*, 509 U.S. 602, 609 (1993). "The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, 'as *punishment* for some offense.'" *Id.* at 609–10 (quoting *Browning-Ferris*, 492 U.S. at 265) (emphasis in original). Thus, a civil penalty can be considered an Eighth Amendment "fine," but only if it "can . . . be explained as serving in part to punish." *Id.* at 610. "Civil fines serving [solely] remedial purposes do not fall within the reach of the Eighth Amendment." *Korangy v. FDA*, 498 F.3d 272, 277 (4th Cir. 2007).

With respect to the PSC's partial disgorgement order, under which SmartEnergy must refund customers a portion of amounts those customers paid, the complaint does not plausibly allege that it serves "to punish" SmartEnergy in the sense required to make out an Eighth Amendment claim. The PSC has statutory authority to issue remedies including to "order a refund or credit to a customer." Md. Code Ann., Public Utilities Article § 7-507 (k)(1). That is the authority pursuant to which the PSC issued its SmartEnergy refund order. *See* ECF No. 4-3 at 65. Moreover, there is no dispute that, as amended in April 2025, the refunds that the PSC ordered SmartEnergy to pay were only a portion of the revenues that SmartEnergy received from those customers. April 2025 Order at 27–31.

Nonetheless, SmartEnergy argues the refund order was not "remedial" for two reasons. First, it argues the refund order should be considered a "fine" for Eighth Amendment purposes because the PSC did not consider whether the consumers suffered any harm, and thus the refund does not aim to "obtain compensation or indemnification." *See* ECF No. 10 at 24 (quoting *Korangy*, 498 F.3d at 277). But the PSC did conclude that customers were harmed, in the form of entering contracts that they would not otherwise have agreed to, and in the form of rates higher than those they would have paid if they had remained with their standard utility. *See* ECF No. 4-3 at 38–39, 49, 59. SmartEnergy disagrees with those conclusions and contends that its customers benefited from its services. The Court need not and does not decide whether SmartEnergy's customers were in fact worse off or better off as a result of switching to SmartEnergy. Here, the PSC concluded that the customers were left worse off as a result of the consumer protection violations that the PSC found SmartEnergy had committed, and that was the basis for its refund order.

Second, SmartEnergy argues that the PSC's intent in levying the refund was to "put SmartEnergy out of business," ECF No. 1 ¶ 59, including in other states, *id.* ¶¶ 56–57. But to state an Eighth Amendment claim on which relief can be granted, SmartEnergy would have to plead facts establishing that the partial refund order itself was not "remedial." *Korangy*, 498 F.3d at 277. Regardless of disputes about whether Maryland regulators had views on whether SmartEnergy should remain in business, SmartEnergy's allegations, and the record subject to judicial notice, do not render the *refund* portion of the order to have been punitive for Eighth Amendment purposes. SmartEnergy has not identified any case where a government order requiring restitution

or refund remotely similar to the order here was held to constitute "punishment" in the Eighth Amendment sense.

For these reasons, SmartEnergy does not state a claim that the refund order constitutes a "fine" subject to the Eighth Amendment.

That leaves the $250,000 civil penalty. At least at the pleadings stage (when SmartEnergy's allegations must be accepted as true), SmartEnergy has shown that the fine comes within the purview of the Eighth Amendment, permitting the Court to ask whether it is constitutionally "excessive." That is because, unlike the disgorgement remedy, it was imposed on SmartEnergy at least in part intended as a punishment for the statutory violations that gave rise to the PSC enforcement action. Accordingly, the Court proceeds to analyze whether the $250,000 fine is "excessive" under the Eighth Amendment.

### iii.  The PSC's rebate order and $250,000 civil penalty do not state an Eighth Amendment excessiveness claim

Even if a penalty is considered a "fine" under the Eighth Amendment, it will be found unconstitutionally excessive "only if it is grossly disproportional to the gravity of the offense." *Korangy*, 498 F.3d at 277 (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1994)) (internal quotations omitted). "The amount of [a] forfeiture must bear some relation to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 334. Because "judgments about the appropriate punishment for an offense belong in the first instance to the legislature," *id*. at 336, courts determine whether a "fine" is "excessive" in part by comparing the penalty assessed to the potential penalties authorized by statute. *See Korangy,* 498 F.3d at 277–278; *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 387–90 (4th Cir. 2015*)*. As discussed above, the Court concludes

that the refund portion of the PSC's order is remedial, not punitive. But even if the refund order were subject to Eighth Amendment scrutiny, both it, and the civil penalty, do not violate the Excessive Fines Clause.

In *Korangy*, the Fourth Circuit upheld a $1.1 million civil fine assessed by the FDA for performing mammograms with equipment that was not properly certified. 498 F.3d at 274, 277. The FDA found 384 violations, each of which yielded a $3,000 penalty. *Id.* at 274–75. The court first noted that the $3,000 penalty was a "substantial reduction of the penalty authorized by Congress," of $10,000 per violation. *Id.* at 277–78. Further, though the court acknowledged that the $1.1 million penalty was "substantial," the court added that the penalty was directly proportional to the number of violations that the plaintiffs committed. *Id.* at 278 ("[T]he gravity of [Plaintiffs'] offenses does not diminish because they repeatedly committed the same offense.").

Similarly, in *Tuomey*, the Fourth Circuit upheld a $237 million jury award under the False Claims Act (FCA) against a hospital for submitting fraudulent Medicare claims. 792 F.3d at 389–90. As authorized by the FCA, the award included treble damages in addition to a mandatory penalty, which the court calculated to be a 3.6:1 ratio of punitive-to-compensatory damages. *Id.* at 389. Though the award presented a "likely death sentence for" the hospital, i*d.* at 390 (Wynn, J. concurring), the "severe" penalty simply reflected "the sheer breadth of the fraud" carried out by the hospital. *Id.* at 389. Further, given that the substantial penalties were ones contemplated and expressly permitted by statute, the court found the award permissible under the Eighth Amendment and deferred to Congress to "consider whether changes to the Stark Law's reach" should be made. *Id.* at 388, 390.

Taking the refund/re-rating issue first, the PSC clearly had statutory authority to impose a refund order, *see* Public Utilities Article §§ 7-507 (k), (l), and the refund order was significantly less than the statutorily authorized maximum penalties that the PSC could have levied. Although not necessarily dispositive, that militates against finding an Eighth Amendment violation. *See Newell Recycling Co., Inc. v. EPA*, 231 F.3d 204, 210 (5th Cir. 2000) ("[I]f the fine does not exceed the limits prescribed by the statute authorizing it, the fine does not violate the Eighth Amendment."). As in *Korangy*, though the refund is significant, its magnitude is directly tied to SmartEnergy's MTSA violations, as found by the PULJ and upheld by the PSC and the Maryland courts. *See Korangy*, 498 F.3d at 278 ("[T]he gravity of [Plaintiffs'] offenses does not diminish because they repeatedly committed the same offense."). Moreover, though SmartEnergy's allegations that the refund was designed to put them out of business may bear on whether the penalty was purely remedial as discussed above, *Tuomey* demonstrates that even a regulatory "death sentence" is not "excessive" when it is authorized by statute and proportional to the "breadth" of the violations. *See* 792 F.3d at 388–90.

As for the civil penalty, the PSC is authorized to impose a $10,000 penalty for each violation, with "each day . . . a violation continues" and "each customer to whom electricity is sold or offered" constituting a separate violation. Md. Code Ann., Public Utilities Article § 7-507(l)(3)–(4). Although SmartEnergy vigorously disputed (and continues to dispute) whether it engaged in any consumer protection violations—and even more vigorously disputes whether the PSC was justified in concluding that SmartEnergy's violations applied to all but a small number of Maryland customers—there is no dispute that SmartEnergy signed up at least 32,000 customers, *see* ECF No. 1

¶ 27 , which means a $250,000 penalty calculates to a fine of less than $8 per customer. Moreover, at earlier stages of litigation, SmartEnergy advocated for a civil penalty of $300,000, i*d.* ¶ 46, which was more than the penalty that the PSC has now imposed. As the fine is well within the PSC's statutory authority and not grossly disproportionate to the violations that the PSC found SmartEnergy had committed, SmartEnergy has not stated an Eighth Amendment claim on which relief can be granted.

SmartEnergy's remaining arguments are also unavailing. First, SmartEnergy argues that, unlike in *Korangy* and *Tuomey*, SmartEnergy's misconduct was not "intentionally illegal," but rather was in "good faith." ECF No. 10 at 26. Although this consideration is relevant under the Excessive Fines clause, *see United States v. Jalaram*, 559 F.3d 347, 355–56 (4th Cir. 2010) (noting that the nature and extent of the violation is one consideration as to whether the penalty is "grossly disproportionate"), Defendants correctly point out that good faith is not a relevant consideration under the MTSA. *See* ECF No. 4-1 at 26 (citing Md. Code Ann., Public Utilities Article § 7-507). Thus, whether SmartEnergy acted in good faith is not relevant to the alleged disproportionality of the refund order to their MTSA violations, but rather one consideration that the PSC can (and did) consider in assessing the civil penalty. *See id.*; April 2025 Order at 32–33.

SmartEnergy also argues that the imposed remedies are "extraordinarily higher than [the PSC's] prior precedent for similar cases." ECF No. 10 at 26. As an initial matter, the Supreme Court of Maryland was unmoved by SmartEnergy's contention that the imposed penalties were "wildly inconsistent with Commission precedent" in support of its claim that the Commission's enforcement was arbitrary and capricious. *See Smart Energy*, 486 Md. at 573–74. Defendants argue that this Court should not engage in a

26

comparative proportionality review, which is not required in the context of cruel and unusual punishment. *See* ECF No. 4-1 at 27; *Pulley v. Harris*, 465 U.S. 37, 50 (1984) (holding that "comparative proportionality review . . . is [not] required in every case in which the death penalty is imposed . . . ."). But even if a comparative proportionality review were appropriate in the context of an Excessive Fines Clause challenge to a civil fine (which this Court assumes without deciding), such comparisons do not help Plaintiff's argument, particularly with the PSC having substantially reduced the refund order and selected a civil fine that is a fraction of the penalty that SmartEnergy feared when it filed this case. In any event, SmartEnergy has not alleged any *specific* facts as to why a $6.5 million refund order and $250,000 fine would be "grossly disproportional" to the MTSA violations that the PULJ found and that the PSC and Maryland courts have upheld.

For these reasons, the remedies imposed by the PSC are not "grossly disproportional" to the statutory consumer protection violations that were found to have been committed by SmartEnergy. Accordingly, the refund order and $250,000 civil monetary penalty imposed by the PSC did not violate the Eighth Amendment, and Count 1 of the complaint will be dismissed.

## C.    Count 2 – Jury Right Claim

SmartEnergy's other claim is that during the PSC proceedings, or during the process of judicial review of the PSC's March 2021 order in the Circuit Court for Montgomery County, it should have had an opportunity to "present its case against legal damages to a jury of its peers." ECF No. 1 ¶ 105. SmartEnergy contends that not having had a jury make, or review, findings of fact pertinent to the enforcement action, or decide the amount of a penalty, constitutes a violation of Article 23 of the Maryland

Declaration of Rights. Article 23 provides, "[t]he right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of $15,000, shall be inviolably preserved." Md. Const. Decl. of Rts. Art. 23.

That claim fails because SmartEnergy did not preserve any such claim, either in the PSC proceedings or the Maryland court proceedings. Under Maryland Rule 2-325(d), in any appeal from an "administrative body when there is a right to trial by jury, the failure of any party to file the demand within 15 days after the time for answering the petition of appeal constitutes a waiver of trial by jury." Md. R. 2-325(d); *see also* Md. R. 2-325(a) ("Any party may elect a trial by jury of any issue triable of right by a jury by filing a demand therefor in writing either as a separate paper or separately titled at the conclusion of a pleading and immediately preceding any required certificate of service."). And under Md. R. 2-325(b), "[t]he failure of a party to file the demand within 15 days after service of the last pleading filed by any party directed to the issue constitutes a waiver of trial by jury."

The Supreme Court of Maryland has made clear that, notwithstanding the jury right set forth in Article 23, "the Legislature and Courts may impose reasonable limitations on that right," including the waiver rules set forth in Rule 2-325. *Scarfield v. Muntjan*, 444 Md. 264, 266, 271 (2015); *see also Erb v. Md. Dep't of Env't*, 110 Md. App. 246, 269 (1996) ("[O]ur review of the record has failed to disclose that appellant made any demand for a jury trial . . . . Thus, even if appellant had [] a right to a jury trial, it was waived."); *Deyesu v. Donhauser*, 156 Md. App. 124, 138 n. 1 (2004) ("[T]he Deyesus failed to file a demand for jury trial within 15 days from the filing of the last pleading in the case, and therefore waived the right to a jury trial.").

Here, it is undisputed that SmartEnergy did not demand a jury trial in accordance with Maryland Rule 2-325 in the administrative proceedings or when it filed its petition for judicial review in the Maryland courts. *See* ECF No. 4-1 at 13–14; ECF No. 10 at 17. SmartEnergy argues that its failure to preserve the argument should be excused because the U.S. Supreme Court subsequently decided *SEC v. Jarkesy*, 603 U.S. 109 (2024), in which it held that the Seventh Amendment requires a jury trial when a plaintiff asserts statutory causes of action that "are modeled on common law" causes of action and "provide a type of remedy available only in law courts." *Id.* at 136. SmartEnergy does not contend that there was any violation of the federal Constitution in this case; it concedes the Seventh Amendment does not apply to the states. ECF No. 10 at 17 n. 4. But the Maryland Supreme Court has held that the Maryland Constitution, "like the Seventh Amendment to the Constitution of the United States," requires that "enjoyment of the right . . . be not obstructed, and that the ultimate determination of issues of fact by the jury be not interfered with." *Att'y Gen. v. Johnson*, 282 Md. 274, 291 (1978). Thus, SmartEnergy argues, the U.S. Supreme Court's ruling in *Jarkesy* means that now, as a matter of *Maryland* law, SmartEnergy should have been granted a jury right in the PSC or judicial review proceedings, and further that the change in law (if in fact the Maryland courts decide to follow *Jarkesy*) means that it need not have preserved the issue contemporaneously.

This argument fails too. Under Maryland law, "[w]here a party fails to elect a jury trial in accordance with statutory provisions and rules for making such election, he waives the right to trial by jury, and he may not thereafter collaterally attack judgment in a separate action for declaratory and injunctive relief." *Bringe v. Collins*, 274 Md. 338, 347 (1975). In *Bringe*, a tenant challenged a previous judicial eviction proceeding

as a violation of his federal and state constitutional right to a jury trial. *Id.* at 339. Shortly after the eviction was affirmed, the U.S. Supreme Court held that a party in an eviction action in the District of Columbia had a right to demand a jury trial, which prompted the tenant to commence a new proceeding for a declaratory judgment that the previous adjudication violated his right to a jury trial. *Id.* at 340 (citing *Pernell v. Southall Realty*, 416 U.S. 363 (1964)). The *Bringe* court held that, regardless of whether the plaintiff, in fact, had a right to a jury trial, he waived it by failing to request one in accordance with the relevant Maryland rules in the initial proceeding. *Id.* at 347. Moreover, especially given that the relevant Real Property Articles governing the eviction proceeding were silent with respect to a jury trial, there was nothing stopping the plaintiff from electing a trial by jury in the initial proceeding. *Id.* at 351. Thus, the plaintiff could not "escape the consequence of his waiver" by collateral attack. *Id.* at 352.

Here, as in *Bringe*, SmartEnergy did not elect a jury trial "in accordance with the . . . rules for making such election" and cannot "escape the consequences of [its] waiver" by relying on intervening case law. *Id.* at 347, 352. There was nothing stopping SmartEnergy from making such an election in the PSC proceedings or when seeking judicial review of the PULJ determination in the Circuit Court, especially given that Public Utility Article section 3-201, like the Real Property Article provisions at issue in *Bringe*, is silent regarding a jury right. *Id.* at 351; *see also Erb*, 110 Md. App. at 269 (holding that, even if the plaintiff had a jury right in an administrative proceeding, it was waived because he made no demand for a jury trial when appealing in the Circuit Court).

This Court need not, and does not, decide whether *Jarkesy* now controls the meaning of Article 23 of the Maryland Declaration of Rights. Regardless of whether

SmartEnergy had a right to a jury trial in its previous proceedings, SmartEnergy waived or forfeited any such right by failing to demand a jury trial at the time. On that basis, Count 2 of the complaint will be dismissed.

### D.    Whether dismissal should be with or without prejudice

When a court concludes that a complaint does not state a claim on which relief can be granted and dismisses it under Federal Rule 12(b)(6), it must also decide whether the dismissal will be with or without prejudice. That depends on whether the complaint's deficiencies are curable such that an amended complaint could be "potentially meritorious," or if "its deficiencies are truly incurable" and "the court has reviewed the claim and found it to be substantively meritless." *McLean v. United States*, 566 F.3d 391, 400–01 (4th Cir. 2009), *abrogated on other grounds by Lomax v. Ortiz-Marquez*, 590 U.S. --, 140 S. Ct 1721 (2020). Here, although SmartEnergy has filed only one version of a complaint, and the Court does not preclude SmartEnergy from filing a motion for leave to file an amended complaint if it believes that amendments to the complaint might cure its aforementioned deficiencies, on the current record the Court concludes that dismissal with prejudice is appropriate.

### III.    CONCLUSION

For the reasons discussed above, SmartEnergy's complaint does not state claims on which relief can be granted under either the Eighth Amendment of the U.S. Constitution (Count 1) or Article 23 of the Maryland Declaration of Rights (Count 2). The complaint will be dismissed with prejudice. This conclusion also means that SmartEnergy's recently filed motion for a temporary restraining order and preliminary injunction, ECF No. 16-1, will be denied as moot. A separate order follows.

Date: <u>July 11, 2025</u>                    <u>     /s/     </u>
                                           Adam B. Abelson
                                           United States District Judge